AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Western District of Texas

FILED 2016 APR 25 PM 1:34
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY

| | |
|---|---|
| United States of America<br>v.<br>Julian PEREZ (1) & San Juana VALDEZ MENCHACA (aka "San Juana PEREZ", "San Juana VALDEZ Perez", "San Juana VALDEZ FLORES," (2)<br><br>*Defendant(s)* | Case No. 1:16-m-292 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **April 19, 2016** in the county of **Travis** in the **Western** District of **Texas**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 8 USC Sections 1324(a)(1)(A)(v)(I) & (a)(1)(A)(ii)- | -Engaging in conspiracy to smuggle illegal aliens and smuggling illegal aliens |
| Title 18 USC 1956(a)(1) | -Laundering monetary instruments |

This criminal complaint is based on these facts:

See Attachment

☑ Continued on the attached sheet.

_____
Complainant's signature

Ron Estrabo, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 04/25/2016

_____
Judge's signature

City and state: Austin, Texas

Andrew W. Austin, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT

1.  The investigation has revealed that Julian PEREZ Perez and his wife, San Juana VALDEZ MENCHACA (aka "San Juana PEREZ", "San Juana VALDEZ Perez", "San Juana VALDEZ FLORES", "SAN JUANA"), are conducting a human smuggling and money laundering operation in violation of Title 8 U.S.C. 1324 and Title 18 U.S.C. 1956.

2.  PEREZ is a Mexican national who has a permanent resident status in the U.S. as of March 30, 1990. PEREZ is a maintenance worker for the Austin Independent School District (AISD). Based on AISD records, PEREZ's annual salary is $33,087.46. On December 18, 1987, PEREZ was arrested by APD for Assault by Contact. The eventual charge and conviction was changed to Simple Assault. PEREZ was assessed a fine for the conviction.

3.  VALDEZ MENCHACA is a U.S. citizen who was born in Mexico to U.S. citizen parents. VALDEZ MENCHACA's criminal history records show that on January 12, 2003, she was arrested for the violation of Title 8 U.S.C. 1324, alien smuggling. She was convicted and sentenced to one year probation. On May 6, 2007, VALDEZ MENCHACA was arrested again for alien smuggling. On October 4, 2007, she was convicted and sentenced to 16 months imprisonment and 3 years of supervised released.

4.  The investigation has revealed that PEREZ maintains "funnel accounts" to receive human smuggling proceeds from VALDEZ MENCHACA's human smuggling operation. A "funnel account" is a bank account opened or held by a nominee or member of the human smuggling organization to receive human smuggling proceeds. This bank account receives cash deposits of less than $10,000 from one or more branch locations in different States, usually geographically distant from the branch where the account was opened. Once the cash is deposited, the nominee makes cash withdrawals in the city and state where the account is domiciled. The time lapse between deposit and withdrawal ranges from minutes to a few days. In addition, the depositor of the cash is unknown to the bank and there is no identification required to deposit the cash.

5.  Based on Western Union wire transfer records, VALDEZ MENCHACA received fifteen (15) wire transfers between July 1, 2014 and March 14, 2015. The wires were between $800.00 and $3,108.80 and had come from various locations, which included Alabama, North Carolina, Florida, and Mexico. The total amount VALDEZ MENCHACA received during the specified time frame was $25,313.05. It is noted that the Western Union records also show that VALDEZ MENCHACA listed her phone number as (512) 988-9527.

6.  The Western Union records also show that PEREZ received twenty three (23) wire transfers between August 2, 2014 and June 19, 2015. The wires were approximately between $300.00 and $3,100.00 and had come from various locations, which included Alabama, Virginia and Mexico. The total amount PREZ received during the specified time frame was $54,499.06. The Western Union records also show that PEREZ listed his phone number as (512) 750-4189.

7.  Bank of America records for PEREZ's bank account number ending in 4639 indicate "JULIAN P PEREZ" as the account holder. The records also show that between

1

September 17, 2014 and February 9, 2015, thirty one (31) counter deposits, all of which were under $10,000, were made into PEREZ's account ending in 4639. The deposits came to a total of $94,550.00. The bank statements also show that PEREZ made corresponding withdrawals on the same day for each deposit amount or within a few days after the deposit was made.

8. Wells Fargo Bank records for PEREZ's checking account ending in 6174 and savings account ending in 5088 indicate that "Julian P PEREZ" is the sole owner of the accounts and were opened on June 29, 2013. The records also show that between January 1, 2014 and October 21, 2015, seventy seven (77) branch deposits, majority of which were under $10,000, were made into the checking account. The deposits came to a grand total of $257,525.97. The bank statements also show that PEREZ made corresponding withdrawals on the same day for each deposit amount or within a few days after the deposit was made. Furthermore, the records show that some of the deposits were partially transferred into PEREZ's savings account ending in 5088.

9. Wells Fargo Bank records for PEREZ's savings account ending in 1021 show that between June 16, 2014 and November 24, 2015, ninety one (91) branch deposits, majority of which were under $10,000, were made into PEREZ's savings account ending in 1021. The deposits came to a grand total of $265,460.00. The bank statements also show that PEREZ made corresponding withdrawals on the same day for each deposit amount or within a few days after the deposit was made.

10. Wells Fargo Bank records for PEREZ's business account ending is 4322 show that between September 4, 2014 and September 10, 2014, four (4) branch deposits, all of which were under $10,000, were made into PEREZ's business account ending in 4322. The deposits came to a grand total of 13,300.00. The bank statements show that PEREZ made corresponding withdrawals on the same day for each deposit amount.

11. Wells Fargo records for accounts in the name of PEREZ's daughter, Karina R. PEREZ (K. PEREZ), checking account number ending in 5991 and savings account number ending in 2428, indicate that K. PEREZ is the sole owner of the account. The account was opened on February 2, 2015. The records also show that the same suspicious funnel account activity occurs in her account. Between February 23, 2015 and October 26, 2015, forty nine (49) branch deposits, all of which were under $10,000, were made into the account ending in 5991. The deposits came to a grand total of $169,825.00. The bank statements also show that K. PEREZ made corresponding withdrawals on the same day for each deposit amount or within a few days of the deposit.

12. JP Morgan Chase (JPMC) account information was obtained for PEREZ's JPMC bank account number ending in 9074. The account revealed that it is a joint checking account PEREZ shares with VALDEZ MENCHACA and was opened on October 25, 2008. The records also show that between January 1, 2014 and November 13, 2015, one hundred and two (102) deposits, majority of which were under $10,000, were made into the account. The deposits came to a grand total of $222,676.00. The bank statements also show that PEREZ made corresponding withdrawals for each deposit amount and were usually conducted on the same day or within a few of the deposit.

13. PEREZ and VALDEZ MENCHACA made a $50,000 deposit into JPMC account number ending in 0965 in March of 2016. PEREZ listed his occupation in the account as "maintenance dir aisd."

14. Based on the review of VALDEZ MENCHACA's Western Union wire transfers, PEREZ's Western Union wire transfers and Bank of America, Wells Fargo and JPMC bank accounts, and K. PEREZ's Wells Fargo account, the sum of all deposits and wire transfers they had received comes to an aggregate total of $1,173,328.60. Majority of the deposits and withdrawals were under $10,000. This method of deposit and withdrawal is consistent with a financial transaction called "Structuring." Structuring is a practice done by criminal elements to evade the bank reporting requirements and to avoid detection by government and law enforcement agencies. It is also noted that the denomination of the deposits appears to coincide with the prevailing rate for human smuggling fees. Furthermore, the deposits were conducted at branch locations geographically distant from the account holder's domicile footprint. Based on my training and experience as a criminal investigator with ICE/HSI, the activity of the deposits and withdrawals in each bank account were consistent with the operation of a funnel account for receiving human smuggling proceeds.

15. Additionally, based on records obtained from financial institutions, PEREZ and VALDEZ MENCHACA are conducting financial activities consistent with the money laundering scheme commonly referred to as Layering. The practice of Layering is conducted to disguise the trail of illicit funds and sever its link from the original crime. This method is done to make it more difficult to detect and uncover the money laundering activity by law enforcement agencies. Normally, the illicit funds are moved from one bank account to another and are sometimes converted into negotiable monetary instruments.

16. A review of the records obtained from JP Morgan Chase (JPMC) shows that one of the suspicious wire transfers PEREZ received was on August 4, 2015. PAYEE 1 of Lexington, KY made a wire transfer of $4,000.00 which was deposited into PEREZ's JPMC account ending in 9074. On February 16, 2016, HSI Special Agent (S/A) Ron Estrabo and APD Detective (Det.) Luis Angeles went to PAYEE 1's residence in Lexington, KY to interview PAYEE 1 regarding the wire transfer he conducted. PAYEE 1 admitted that the $4,000.00 wire transfer he conducted on August 4, 2015 was part of the fee he paid to have his wife, WITNESS 1, a Mexican national who has no legal status to enter or stay in the U.S., smuggled into the U.S. PAYEE 1 stated that around June of 2015, he wanted to bring his wife into the U.S. PAYEE 1 obtained a phone number for a smuggler through unknown subjects in the local community. PAYEE 1 stated that he could not remember the smuggler's phone number. However, PAYEE 1 remembered that he used his phone number to make the phone calls. PAYEE 1 claims that sometime in June or July 2015, an unknown female (FNU LNU) answered the phone when he called the smuggler's phone number. FNU LNU told PAYEE 1 that the smuggling fee was $8,000.00. FNU LNU instructed PAYEE 1 to pay for the first half of the fee before WITNESS 1 crossed the border and the other half of the fee after WITNESS 1 crossed the U.S. border. PAYEE 1 followed the instructions and went to his bank, JPMC, to wire the first half of the payment sometime in July of 2015. PAYEE 1 claims that when the first smuggling attempt was made, the smugglers left his wife in the middle of a field on the Mexican side of the border. PAYEE 1 said that he called FNU LNU to find out what happened. FNU LNU told PAYEE 1 to have his wife call her in order to arrange another border crossing. The second attempt was

successful and that WITNESS 1 arrived in the U.S. sometime in August of 2015. PAYEE 1 added that he wired the rest of the payment through his JPMC account subsequent to WITNESS 1's arrival in the U.S.

17. On February 17, 2016, HSI S/A R. Estrabo and APD Det. L. Angeles returned to PAYEE 1's residence to speak with WITNESS 1. WITNESS 1 was encountered and identified and the residence. When asked if she was willing to speak with the investigating agents regarding her border crossing, WITNESS 1 agreed and provided a statement. WITNESS 1 claims that she was born in Mexico and is a Mexican national. WITNESS 1 stated that she entered the U.S. on August 1, 2015 by crossing the Rio Grande River at night near Laredo, TX. WITNESS 1 admitted that she was travelling with her sister when she made her illegal entry into the U.S. WITNESS 1 claims that when she and her sister started their attempt to enter the U.S. sometime in July 2015, she spoke to a subject on the phone who called herself "LA TIA." WITNESS 1 stated that LA TIA sounded like a female who is somewhere between 40 and 50 years of age. WITNESS 1 said that LA TIA gave her an address for a hotel to stay at in Nuevo Laredo, MX. When they arrived at the hotel, two unknown Hispanic male subjects met them at the hotel. WITNESS 1 described them as thin, medium height, and between 25 and 30 years of age. The two male subjects helped WITNESS 1, her sister, and approximately 15 others cross the border into the U.S. However, WITNESS 1 claims that they were apprehended by U.S. Border Patrol (USBP) and was sent back to Mexico. It is noted that records checked regarding previous apprehensions indicated that WITNESS 1 was apprehended by USBP on July 13, 2015 in Laredo, TX. When she returned to Mexico, she contacted LA TIA and made arrangements to attempt another border crossing. After three weeks, the second border crossing was successful. They were escorted by the same two unknown male subjects. WITNESS 1 claims that they walked for about 15 minutes before they were picked up by a van being driven by one male. WITNESS 1 noted that the two unknown male subjects who escorted them into the U.S. went back to Mexico. After a 20 minute ride in the van, they were taken to a house. WITNESS 1 could not provide a description for the house. WITNESS 1 claims that there was no security at the house and that 3 other subjects who had recently crossed the border were also at the house. After approximately 2 hours, an unknown male arrived in a truck. WITNESS 1 describe unknown male as well dressed, heavy set build, medium height, black hair, spoke Spanish, and approximately 40 to 45 years of age. The unknown male brought clothes, food, and water. The unknown male also told them that someone will pick them up and take them to a hotel that evening. Later that evening, an unknown female arrived at the house. WITNESS 1 described the unknown female as an older lady who is approximately 50 years of age, heavy set, and spoke Spanish. WITNESS 1 noted that the unknown female also drove a newer truck. The unknown female took WITNESS 1, her sister and two others to a hotel. WITNESS 1 claims they stayed at the hotel for approximately 4 days. While at the hotel, the unknown female would drop by once a day to bring them food. PAYEE 1 noted that while WITNESS 1 and her sister were at the hotel, he had called FNU LNU to check the status. FNU LNU told PAYEE 1 that his wife made it to the U.S. side of the border. WITNESS 1 claims that on the fourth night, the unknown female loaded them into the trailer of an 18 wheeler truck. WITNESS 1 noted that there were others inside the trailer. WITNESS 1 claims she could not describe any markings on the truck because it was too dark. WITNESS 1 stated that they rode in the trailer for about 2 hours before the truck stopped to offload the people in the trailer. WITNESS 1 said that once they got off the trailer, another unknown female directed her group of travelers to load into a car. WITNESS 1 noted that her group was called the "LA TIA" group. WITNESS 1 described the unknown

4

female driver of the car as Hispanic, approximately 30 years of age, heavy set build, and medium height. WITNESS 1 noted that the car was a black 4 door sedan. WITNESS 1 claims that the unknown female driver took them to a house and stayed there for one night. WITNESS 1 stated that the house looked like it was at a ranch. WITNESS 1 said that they stayed in the living room of the house with 8 others. PAYEE 1 noted that during this time, he had contacted FNU LNU and insisted on knowing the status of his wife. PAYEE 1 claims that FNU LNU had an Austin, TX prefix phone number and that FNU LNU let WITNESS 1 use her phone to call him. PAYEE 1 claims that after WITNESS 1 arrived into the U.S., FNU LNU instructed him to send the payment. FNU LNU told PAYEE 1 that WITNESS 1's trip from Austin, TX to Lexington, KY will be his responsibility. However, PAYEE 1 said that FNU LNU arrange for someone to drive his wife and her sister to Kentucky. WITNESS 1 claims that after one day, the unknown female driver drove her and her sister to Kentucky in a grey sports utility vehicle. WITNESS 1 said they left around noon and arrived in Lexington, KY at approximately 5:00 a.m. the following day. PAYEE 1 claims that the unknown female driver came into their residence to drop off his wife and collect the fee for driving them to Kentucky. PAYEE 1 claims he paid the unknown female driver $650.00.

18. It is noted that PAYEE 1's JPMC account shows a $6,000.00 deposit conducted on July 10, 2015. On the same day, PAYEE 1 withdrew $6,000.00 from his JPMC account. When asked to explain the transactions in his JPMC bank account, PAYEE 1 said that when he first attempted to send the $6,000.00 smuggling fee for WITNESS 1 and her sister, there was some confusion on how he was supposed to do it. PAYEE 1 explained that he needed to send $6,000.00 to pay for WITNESS 1 and her sister's initial smuggling fee of $3,000.00 each. He deposited $6,000.00 into his JPMC account to wire the money, but FNU LNU told him to send it via Western Union. PAYEE 1 withdrew the money from his account on the same day and went to Western Union to wire the money. PAYEE 1 found out that the fees were too high so he asked FNU LNU for another way to send it. PAYEE 1 claims that he was instructed to wire the fee into two separate accounts with Wells Fargo. PAYEE 1 claims that one of the beneficiaries of the wire transfer belonged to a male and the other was a female. PAYEE 1 could not recall the names or the numbers on the accounts. It is noted that a review of Wells Fargo bank accounts belonging to PEREZ with account number ending in 1021 and PEREZ's daughter, Karina PEREZ with account number ending in 5991, shows that they each received a $3,000.00 deposit on July 14, 2015. Moreover, PAYEE 1 explained that the $4,000.00 deposit PAYEE 1 made on August 4, 2015 into PEREZ's JPMC checking account ending in 9074 was a payment for the remaining balance he owed for smuggling his wife.

19. Records obtained from JPMC shows that one of the suspicious wire transfers PEREZ received was on August 19, 2015. PAYEE 2 of Lexington, KY deposited $3,500.00 into PEREZ's JPMC checking account ending in 9074. On February 17, 2016, HSI S/A Ron Estrabo and APD Det. Luis Angeles located PAYEE 2 in Lexington, KY. When asked if she would be willing to speak with the investigating agents regarding the wire transfer she conducted on August 19, 2015 through her JPMC bank account to deposit $3,500.00 to PEREZ's JPMC bank account ending in 9074, PAYEE 2 agreed to provide a statement. PAYEE 2 admitted that she sent the money to help a relative pay the smuggling fee to bring another relative, a Mexican national who has no legal status to enter or stay in the U.S., from Mexico into the U.S. PAYEE 2 explained that her cousin, WITNESS 2, asked her if WITNESS 2's cousin, PAYEE 3, could use her JPMC bank account to send money. WITNESS 2 explained to PAYEE 2 that PAYEE 3

5

needed help sending money to pay the smuggling fee for another relative. PAYEE 2 claims she does not know the name of the relative being smuggled. PAYEE 2 claims that PAYEE 3 gave her the money to pay the smuggler. PAYEE 2 subsequently went to JPMC to send the money as per PAYEE 3's instruction. When asked if she has any contact information for PAYEE 3, PAYEE 2 claims she does not know where PAYEE 3 is and that PAYEE 2 does not have any contact information for PAYEE 3.

20. Records obtained from JPMC shows that on July 7, 2015, PAYEE 4 of Louisville, KY wired $2,000.00 through her JPMC account. The beneficiaries of the wire transfer are noted as "Julian P Perez OR San Juana Valdez Del Valle, TX." Additionally, on August 19, 2015, PAYEE 4 conducted a second wire transfer to deposit $1,000.00 into PEREZ's JPMC bank account ending in 9074. On February 18, 2016, HSI S/A Ron Estrabo and APD Det. Luis Angeles went to PAYEE 4's residence in Louisville, KY to interview PAYEE 4 regarding the wire transfers she conducted through her JPMC bank account. PAYEE 4 was encountered and identified at the residence by the investigating agents. When asked if she would talk with the investigating agents regarding the bank transactions, PAYEE 4 agreed to provide a statement. PAYEE 4 admitted that the wire transfers she conducted were part of the fee she paid to have her sibling, WITNESS 3, a Mexican national who has no legal status to enter or stay in the U.S., smuggled into the U.S. PAYEE 4 stated that she obtained a phone number for the smuggler sometime in June of 2015. PAYEE 4 claims she does not have the phone number anymore but added that she used her cell phone to make the calls. PAYEE 4 provided her cell phone number to agents. PAYEE 4 claims that when she made the call, she spoke to a female named "SAN JUANA." PAYEE 4 negotiated the price with SAN JUANA to bring WITNESS 3 from Mexico to Austin, TX for $5,000.00. PAYEE 4 arranged for WITNESS 3 to enter the U.S. sometime in August of 2015. When WITNESS 3 arrived in Nuevo Laredo, Mexico, PAYEE 4 received a call from him to let her know he was near the border. PAYEE 4 related that WITNESS 3 was in Nuevo Laredo for approximately 2 weeks before he crossed the border. When asked about the $2,000.00 wire transfer she conducted, PAYEE 4 could not remember the details of the transaction. However, she claims that she remembers sending $2,000.00 sometime during WITNESS 3's illegal border crossing arrangement. PAYEE 4 added that she sent the money to the same person who received the payments for the smuggling fee. It is noted that on July 7, 2015, JPMC records shows that PAYEE 4 wired $2,000.00 through her account. The beneficiaries of the wire transfer are noted as "Julian P Perez OR San Juana Valdez Del Valle, TX." Sometime after her brother made it across the U.S. border, PAYEE 4's other brother, PAYEE 3, who lives in Lexington, KY, wired $3,500.00 to SAN JUANA. PAYEE 4 explained that PAYEE 3 asked PAYEE 2 for help with the wire transfer. PAYEE 4 claims that WITNESS 1 contacted PAYEE 2 to assist PAYEE 3. It is noted that PAYEE 2's JPMC bank account shows that she conducted a wire transfer on August 19, 2015 to deposit $3,500.00 into PEREZ's JPMC bank account ending in 9074. PAYEE 4 related that SAN JUANA called her again and told her to wire another $1,000.00. When SAN JUANA asked PAYEE 4 if she had a bank account, PAYEE 4 told her yes. SAN JUANA provided PAYEE 4 with instructions to wire the money through JPMC. It is noted that PAYEE 4's JPMC bank account shows that she conducted a wire transfer on August 19, 2015 to deposit $1,000.00 into PEREZ's JPMC bank account ending in 9074. PAYEE 4 claims that WITNESS 3 arrived in Louisville, KY the day after she completed the wire transfer.

21. PAYEE 4 added that she had a prior encounter with SAN JUANA when SAN JUANA helped her get smuggled into the U.S. sometime in March of 2013. PAYEE 4 related that before she entered the U.S., she was working for an attorney in Nuevo Laredo, Mexico. The attorney referred her to SAN JUANA when she decided that she wanted to go to the U.S. The attorney told PAYEE 4 that the fee was going to be $3,500.00. PAYEE 4 gave the money to the attorney to pay the fee. PAYEE 4 assumes that the attorney passed the money on to SAN JUANA. When she crossed the border, PAYEE 4 related that she was travelling with 3 females and 2 males. They were being escorted by 2 men who PAYEE 4 described as Hispanic and approximately 25 or 26 years of age. PAYEE 4 related that after about 15 minutes of walking, an unknown male subject picked them up in a pickup truck. PAYEE 4 said that they all got in the bed of the truck and rode for about 20 minutes. They arrived at a small house in a residential area and stayed there for a few hours. PAYEE 4 stated that the men and women stayed in separate rooms. PAYEE 4 said that there was a young male in charge at the house and had brought them food. PAYEE 4 stated that SAN JUANA would stop at the house on occasion to take others out of the house. SAN JUANA eventually picked PAYEE 4 and another female up and took them to an 18 wheeler truck. SAN JUANA instructed them to get in the front cab of the 18 wheeler and pay the driver. PAYEE 4 saw SAN JUANA give the other female the money to pay the driver. PAYEE 4 claims she does not know how much the driver got paid. PAYEE 4 described the truck driver as skinny, spoke Spanish, short black hair and between 40 and 50 years of age. PAYEE 4 claims they rode in the truck for about 20 minutes. During the trip, the truck stopped for about 1 minute then moved on. At the end of the trip, the driver stopped at a gas station then made a phone call in English. PAYEE 4 and the other female got off the 18 wheeler truck. Next, they got into a Ford 4x4 truck. PAYEE 4 described the Ford truck driver as short in height, young, heavy set, bald, and only spoke English. The driver told them that they were going to Austin, TX. After some time, the driver stopped on the road under a bridge. The driver handed them off to SAN JUANA. PAYEE 4 stated that SAN JUANA took them the rest of the way to Austin, TX. When they arrived in Austin, they stopped at an apartment complex and dropped off the other female. After the drop off, they continued on and went to a house which SAN JUANA referred to as "her house." While at the house, PAYEE 4 noticed a young child who looked like he had Down syndrome. PAYEE 4 described the house as a big 2 story house that had a gate. They then moved on to another house which took about an hour to get to. PAYEE 4 described the next house as small, looked like it was being remodeled, and in a residential neighborhood. While at the house, PAYEE 4 called for someone to pick her up. After 2 days, she was picked up in the morning near a McDonald's restaurant. PAYEE 4 claims that SAN JUANA tried to charge her more money, but she had no more money to give her. PAYEE 4 claims she went to Kentucky after leaving Texas. When asked to describe SAN JUANA, PAYEE 4 said that she was approximately 46 years of age, long curly hair, and heavy set build. Upon conclusion of the interview, PAYEE 4 was presented with a photo of San Juana VALDEZ MENCHACA. PAYEE 4 positively identified VALDEZ MENCHACA as the subject she knew as SAN JUANA.

22. While at PAYEE 4's residence, the investigating agents encountered PAYEE 4's brother, WITNESS 3. The investigating agents asked if WITNESS 3 would be willing to speak to the investigating agents regarding his illegal entry into the U.S. in August of 2015. WITNESS 3 agreed and provided the following statements. WITNESS 3 stated that when he spoke to SAN JUANA, she told him to be in Nuevo Laredo, MX on a Friday somewhere close to the center of the town. When he arrived, WITNESS 3 called SAN JUANA to let her know about his arrival.

7

SAN JUANA told him that she will send someone to pick him up. WITNESS 3 said that he was eventually picked up by an unknown male subject at a Home Depot store near a plaza in Nuevo Laredo. WITNESS 3 claims that he was picked up with two other unknown individuals. They were taken to a hotel and stayed there for about 1 week. While at the hotel, someone called them and told them to stay at the hotel. The unknown subject on the phone also told them to ask the hotel manager to take them to a bank to deposit the money for the smuggling fee. WITNESS 3 added that SAN JUANA also called them on occasion to give them an update. The day before they crossed the border, SAN JUANA went to the hotel to take pictures of them. SAN JUANA also asked them for their shoe sizes and clothing sizes. SAN JUANA told them to be ready and that they were crossing in the morning. The next morning, at approximately 1:00 am, SAN JUANA arrived at the hotel. SAN JUANA subsequently got a call telling her that the smugglers are ready. SAN JUANA gave them a ride close to the river. When they arrived, they were met by two unknown male subjects who WITNESS 3 described as approximately 19 to 21 years of age, medium height, medium weight, and skinny. WITNESS 3 claims he does not remember their names. WITNESS 3 said that one of the subjects had a tattoo on his shoulder. However, WITNESS 3 could not make out what the tattoo looked like. When they crossed the river, WITNESS 3 claims there were 7 of them. The two smugglers told them to take off their clothes and shoes before crossing the river. Once they crossed, they put their clothes back on, but threw away any clothing that got wet. WITNESS 3 related that they walked for about 45 minutes, and then waited. 45 minutes later, WITNESS 3 heard one of the smugglers make a phone call. About 5 minutes later, a Ford Explorer sports utility vehicle (SUV) arrived at their location. WITNESS 3 described the driver of the Ford SUV as Hispanic male, short hair, and approximately 20 years of age. WITNESS 3 did not get his name. When they got the "all clear signal", they loaded the back of the Ford SUV and were told by the driver to stay down. After a 5 minute ride, they arrived at a house. While at the house, 4 individuals got off the Ford SUV and loaded into another pickup truck. The pickup truck and the Ford SUV immediately left the house together and rode for another 30 minutes. They arrived at another house, which WITNESS 3 described as being situated in a residential Hispanic neighborhood. When they went into the house, WITNESS 3 noticed that there were mattresses on the floor. WITNESS 3 noted that the drivers called someone on the phone to give an update that they had arrived at the house. WITNESS 3 claims that they arrived at the house around 5:00 am. At around 10:00 am, WITNESS 3 and two others were picked up by another SUV driver. WITNESS 3 could not remember the driver's name, but described him as Hispanic male, short hair, heavy set, spoke Spanish, and approximately 36 years of age. The driver took them to a hotel somewhere in Laredo, TX. WITNESS 3 noted that there were 2 other individuals in the room when they arrived. The driver told them they were to wait there until the money for their smuggling fee had been deposited. WITNESS 3 claims they stayed there for about 3 days. On the third day, the driver picked them up at around 8:00 pm. They were taken to an 18 wheeler truck and were told by the driver to get into the back trailer of the truck. While waiting inside the trailer, another group arrived and got into the trailer with them. Shortly thereafter, the truck left and rode for about 1 hour. When the truck stopped, WITNESS 3 heard someone outside yelling if anyone was inside the trailer. The truck started up again and rode for another 3 hours. When the truck stopped the second time, they were off loaded. WITNESS 3 noted that the location where they stopped looked like a gas station. WITNESS 3 advised the trailer he had been traveling in was loaded with multiple subjects. The subjects were all scattered throughout the trailer mixed in with the cargo. WITNESS 3 could not give a specific number of individuals in the trailer due to

the low light conditions, but advised there were many subjects. As the large group began to exit the back of the trailer, there were multiple vehicles waiting for the group. Individual groups were taken to specific vehicles waiting for them. WITNESS 3 claims that SAN JUANA was at the location and picked them up in a newer model white Nissan pickup truck with a double cab. SAN JUANA told them that they were in San Antonio, TX and that they were going to her house in Austin, TX. When they arrived in Austin, TX, SAN JUANA took them to her house. WITNESS 3 noticed that a "sick boy" was at the house when they arrived. WITNESS 3 also noted that SAN JUANA's son-in-law was at the house. WITNESS 3 claims they slept in the living room of the house. SAN JUANA told WITNESS 3 and the others that she was going to call their families. WITNESS 3 stated that SAN JUANA called his sister, PAYEE 4, and told her that he was in Austin, TX. PAYEE 4 interposed at this point in the interview and added that when SAN JUANA called her to let her know that WITNESS 3 had arrived in Austin, TX, SAN JUANA asked for another $1,000.00. It is noted that PAYEE 4's JPMC account shows that on August 19, 2015, PAYEE 4 transferred $1,000.00 into a checking account ending in 9074. The account had been identified to belong to PEREZ. Upon conclusion of the interview, WITNESS 3 was presented with a photo of San Juana VALDEZ MENCHACA. WITNESS 3 positively identified VALDEZ MENCHACA as the subject he knew as SAN JUANA.

23. Subscriber information and toll records for VALDEZ MENCHACA's phone number of (512) 988-9527 (Target Phone 1) were obtained and reviewed. As stated in paragraph 5 of this affidavit, Western Union records show Target Phone 1 as VALDEZ MENCHACA's phone number. Based on the records provided by AT&T, the subscriber information for Target Phone 1 is listed as "PREPAID CUSTOMER" with an address of 17330 Preston Rd, Dallas, TX 78252. Target Phone 1 has been AT&T's customer since December 27, 2011.

24. A review of Target Phone 1's toll records show that between June 3, 2015 and August 24, 2015, fifty-seven (57) phone calls were made between PAYEE 1's phone and Target Phone 1.

25. In addition, a review of Target Phone 1's toll records show that between May 15, 2015 and August 6, 2015, thirty five (35) phone calls were made between PAYEE 4's phone and Target Phone 1.

26. Subscriber information and toll records were obtained and reviewed for phone number (512) 750-4189 (Target Phone 2). Target Phone 2 was listed as PEREZ's phone number on PEREZ's Wells Fargo bank account ending in 4322. Furthermore, as stated in Paragraph 6 of this affidavit, Western Union records also listed Target Phone 2 as PEREZ's phone number. The records T-Mobil provided indicate that the subscriber for Target Phone 2 is listed as "JULIAN PEREZ" of 5208 King Charles Dr., Austin, TX 78724. Target Phone 2's account service date started on 08-05-2015. However, the account's service was canceled on 10-15-2015.

27. A review of the toll records for Target Phone 2 indicates that between August 6, 2015 and October 5, 2015, 10 phone calls were made between PAYEE 4 and Target Phone 2.

28. On March 16, 2016, HSI SA R. Estrabo contacted PAYEE 4 to inquire about the phone calls she made with Target Phone 2. PAYEE 4 stated that she also communicated with VALDEZ MENCHACA through Target Phone 2 while her brother was being smuggled into the U.S. PAYEE 4 said that a few days after her brother arrived in Louisville, KY, VALDEZ

9

MENCHACA kept calling her through Target Phone 2 to collect another $200 or $300 for her brother's smuggling fee.

I swear the information contained in this affidavit is true and correct to the best of my knowledge and belief.

_____
Ron C. Estrabo, Special Agent
Homeland Security Investigations

Sworn to before me this
___25th___ day of ___April___, 2016.

_____
Andrew W. Austin
UNITED STATES MAGISTRATE JUDGE
United States District Court